Peter J. Aschenbrenner
Aschenbrenner Law Offices, Inc.
Physical address: 823 Third Avenue, Fairbanks, Alaska 99701
Mailing address: P.O. Box 73998, Fairbanks, Alaska 99707
Telephone (907) 456-3910 • Fax: (907) 456-8064
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| INTERIOR REGIONAL HOUSING AUTHORITY, a Public Corporation and Tribally Designated Housing Entity,<br><br>          Plaintiff,<br><br>vs.<br><br>BARBARA ALMQUIST, individually, THE VILLAGE OF DOT LAKE aka THE NATIVE VILLAGE OF DOT LAKE, WILLIAM J. MILLER, CHARLES P. MILLER and JOHN DOES NO. 1 - 3, all in their official capacities,<br><br>          Defendants. | Case No. 4:06-CV-00018 RRB |

## PLAINTIFF'S OPPOSITION TO
## DEFENDANT ALMQUIST'S MOTION TO DISMISS
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND
## PLAINTIFF'S OPPOSITION TO DEFENDANTS DOT LAKE, WILLIAM J. MILLER
## AND CHARLES P. MILLER'S MOTIONS TO DISMISS

Plaintiff Interior Regional Housing Authority, by and through its undersigned counsel,

Aschenbrenner Law Offices, Inc., hereby files (a) its own Motion for Partial Summary

Judgment on Count I as to all Defendants and (b) its Opposition to Defendant Almquist's Cross

Motion to Dismiss at Docket No. 15, (c) its Opposition to both Defendants' Dot Lake, William

Opposition to Defendants' Motions to Dismiss/Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 1

J. Miller and Charles P. Miller's Motion to Dismiss for Lack of Federal Question dated September 23, 2006 as Docket No. 45; and (d) its opposition to Dot Lake and the Millers' Motion to Dismiss Based on 28 U.S.C. 2283 dated October 19, 2006 at Docket No. 50.

The Court's Order Granting Almquist's Motion to Dismiss Count I, which is the subject of IRHA's Fed. Rule Civ. Pro. Rule 60(b) motion, denied all remaining motions as moot, and closed the case.[1]  In a separate Rule 60(b) motion, IRHA respectfully requests that this order be vacated *in toto* or, in the alternative, vacated as to Dot Lake and the Millers (the details of which are explained in that motion), so that this motion and oppositions, as detailed above, may be briefed, argued and decided by the court in the normal and deliberative process.

IRHA's Motion for Partial Summary Judgment is made pursuant to Fed. Rule Civ. Pro. Rule 56 and is supported by the attached Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment, the depositions of William J. Miller and Charles P. Miller, and the Affidavit of Steve Ginnis (previously filed).

A proposed form of order is lodged herewith.

DATED at Fairbanks, Alaska this 6th day of November, 2006.

ASCHENBRENNER LAW OFFICES, INC.
Attorneys for Plaintiff IRHA

By:  /s/ Peter J. Aschenbrenner
        Peter J. Aschenbrenner
        Bar No. 7210037

---

[1] "Any and /or all remaining motions are DENIED as moot, and this matter is now closed."  11/2/2006 Order at p. 6.

Opposition to Defendants' Motions to Dismiss/Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 2

Peter J. Aschenbrenner
Aschenbrenner Law Offices, Inc.
Physical address:  823 Third Avenue, Fairbanks, Alaska  99701
Mailing address: P.O. Box 73998, Fairbanks, Alaska  99707
Telephone (907) 456-3910 • Fax: (907) 456-8064
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| INTERIOR REGIONAL HOUSING AUTHORITY, a Public Corporation and Tribally Designated Housing Entity,<br><br>                    Plaintiff,<br><br>vs.<br><br>BARBARA ALMQUIST, individually, THE VILLAGE OF DOT LAKE aka THE NATIVE VILLAGE OF DOT LAKE, WILLIAM J. MILLER, CHARLES P. MILLER and JOHN DOES NO. 1 - 3, all in their official capacities,<br><br>                    Defendants. | Case No. 4:06-CV-00018 RRB |

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT ALMQUIST'S MOTION TO DISMISS
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND
PLAINTIFF'S OPPOSITION TO DEFENDANTS DOT LAKE, WILLIAM J. MILLER
AND CHARLES P. MILLER'S MOTIONS TO DISMISS**

        Plaintiff Interior Regional Housing Authority ("IRHA") files this memorandum in

opposition to the three motions set forth above and its own (in effect cross-motion) for partial

summary judgment.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 1

## I.    INTRODUCTION

Defendant Barbara Almquist moved to dismiss Count I of IRHA's complaint on July 6, 2006; IRHA was granted a Rule 56(f) continuance to take the depositions of William J. Miller and Charles P. Miller on August 28, 2006.   The essence of IRHA's position was developed both in that motion and at the July 6, 2006 hearing on its Motion for Preliminary Injunction.

This is a case that turns on the lack of authority of Defendants William Miller and Charles Miller to put their signatures to a document titled "Tribal Ordinance," prepared in a half day by Atty. Walleri and signed by them in "five to ten minutes" as  Defendant Charles Miller eventually admitted; if they were not acting for the Village of Dot Lake then the Tribe could not defend a challenge to that ordinance on sovereign immunity grounds, and, given the previous "consensual commercial relationship" between IRHA and the Village of Dot Lake, federal question jurisdiction could be invoked on that ground.   As more fully explained in the motion for Rule 60(b) relief, no explicit order has been entered vacating the order for Rule 56(f) relief or suppressing the depositions or vacating the time for the IRHA's oppositions due November 6 to be filed.

Therefore, this brief constitutes and supports IRHA's (a) own Motion for Partial Summary Judgment on Count I and (b) its Opposition to Defendant Almquist's Motion to Dismiss dated July 6, 2006 at Docket No. 15; (c) its Opposition to both Defendants' Dot Lake, William J. Miller and Charles P. Miller's Motion to Dismiss for Lack of Federal Question dated Spetember 23, 2006 at Docket No. 45; and (d) its opposition to Dot Lake and the Millers' Motion to Dismiss Based on 28 U.S.C. 2283 dated October 19, 2006 at Docket No. 50.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 2

II.     **RECORD ON IRHA's MOTION FOR PARTIAL SUMMARY JUDGMENT AND ON ALL THREE OPPOSITIONS REFERENCED ABOVE.**

This motion is based on the following documents:

Deposition of William J. Miller of September 6, 2006;

Deposition of Charles P. Miller of September 6, 2006;

Affidavit of Steve Ginnis dated June 27, 2006;

Documents Attachment filed in Support of Its Motions for Temporary Restraining Order and Preliminary Injunction, which includes the following documents:

1.      Ordinance No. 06-01-01 dated June 1, 2006.  (3 pages);

2.      Log Notes from hearing held on June 14, 2006 in Case No. 4FA-06-1421 CI, *IRHA v. Almquist*.  (10 pages);

3.      Constitution of the Native Village of Dot Lake Alaska, unexecuted.  (8 pages);

4.      Constitution of the Native Village of Dot Lake Alaska, unexecuted (13 pages);

5.      Letter from Jim Thomas, Acting Director of Tribal Services with the US Department of the Interior, Bureau of Indian Affairs to Shirley Lee at Tanana Chief's Conference, Inc. dated September 16, 1994.  (10 pages);

6.      Goals & Priorities Spreadsheet – Upper Tanana – Tok 1998 & 1999. (1 page);

7.      IRHA Summary Allocation for Funding for FY 1998 NAHASDA Activities. (2 pages);

8.      IRHA Landlord – Tenant Rental Contract dated August 22, 2003. (5 pages);

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 3

9.    Documents pertaining to IRHA's attempts to transfer ownership of Dot Lake Triplex dated October 2004.  (5 pages);

10.    Letter from Wayne Mundy to Michael Walleri dated February 21, 2006.  (1 page); and,

Documents Attachment in Support of Plaintiff's Opposition to Defendant Almquist's Motion to Dismiss, Plaintiff's Motion for Partial Summary Judgment, and Plaintiff's Opposition to Defendants Dot Lake, William J. Miller and Charles P. Miller's Motions to Dismiss, which includes the following documents.  Numbering of the documents continues from IRHA's first Documents Attachment filed on June 28, 2006 as follows:

11.    Constitution of the Native Village of Dot Lake, signed January 3, 1986. (3 pages);

12.    Survey from the Dot Lake Village Council to "All Adult Tribal Members," dated July 22, 1994.  (2 pages);

13.    Correspondence from Samuel S. Demientieff, Superintendent, Bureau of Indian Affairs, to "William Miller, President," dated June 9, 1995.  (1 page);

14.    Correspondence from the Bureau of Indian Affairs to "Honorable William Miller, President, Native Village of Dot Lake," dated August 8, 1995.  (1 page);

15.    Lease Agreement between Dot Lake Village Council and IRHA dated January 19, 1998.  (4 pages);

16.    Fax coversheet from Dot Lake Village Council to "Mike Walleri" dated June 1, 2006 at 1316 hrs.  (1 page);

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 4

17.    Subpoena in a Civil Case to William J. Miller in Case No. 4:06-CV-00018 RRB. (4 pages);

18.    Courtview Docket Search for Case No. 4FA-06-1421 CI.  (5 pages);

19.    25 U.S.C. § 4137/24 C.F.R. § 982.310(d)(iv) Notice to the Tenant of Termination of Tenancy to Barbara Almquist of January 13, 2006, signed by Robin Johnson. (2 pages);

20.    AS 34.03.290(b) Notice to Tenant of Termination of Tenancy to Barbara Almquist of January 13, 2006, signed by Robin Johnson.  (1 page);

21.    IRHA's Complaint for Unlawful Detainer in Case No. 4FA-06-1421 CI dated March 30, 2006.  (2 pages);

22.    Defendant's Bench Memorandum in Case No. 4FA-06-1421 CI dated May 10, 2006.  (13 pages);

23.    Defendant's Supplemental (Reply) Memorandum in Case No. 4FA-06-1421 CI dated May 16, 2006.  (7 pages);

24.    Defendant's Second Supplemental Bench Memorandum in Case No. 4FA-06-1421 CI dated June 1, 2006.  (8 pages);

25.    Defendant's Fifth (5th) Bench Memorandum in Case No. 4FA-06-1421 CI dated May 10, 2006. (8 pages);

26.    Almquist's Opposition to Motion for Reconsideration in Case No. 4FA-06-1421 CI dated August 25, 2006.  (8 pages);

27.    Order After Reconsideration in Case No. 4FA-06-1421 CI dated September 14, 2006.  (1 page); and,

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 5

28.     Exhibit A to Almquist's Motion for Attorney's Fees in Case No. 4FA-06-1421

CI dated September 21, 2006.  (9 pages).

## III.   ARGUMENT: THE 1986 CONSTITUTION DOES NOT AUTHORIZE THE "TRIBAL ORDINANCE" AT ISSUE, OR ANY ORDINANCES.

A.  History of the 1986 constitution.

At the Deposition of William Miller, and in response to a subpoena duces tecum

properly served [Doc. Att. 17], Defendant William Miller brought with him the following

documents, listed above as Doc. Atts. 11-16.   Of paramount importance is the 1986

Constitution [Doc. Att. 11] which Mr. Miller first cited as authority for his role as tribal

official; he did not maintain that position throughout the deposition as will be explained later.

On January 3, 1986, three people signed a three-page document which they called a

constitution.  Page 3.  These three people, Ruth Charles, Stella Miller and William J. Miller,

signed the 1986 constitution, certifying their presence "at a meeting called for the purpose of

adopting" the constitution on that date and further certifying that for constitution was "duly

adopted at this meeting by a vote of 16 for and 0 against, and that at least thirty (30) percent of

the adult Tribal Members were present and cast their ballots."  The 1986 Constitution was

"dead on arrival," as one might imagine from a "constitutional" meeting which was unable to

certify from the beginning that it spoke for a majority of the tribe or that it would be submitted

for such approval at some time.

Dot Lake, the BIA, and Congress have all ignored the existence of the 1986

constitution.  No one used it as a constitution.  The constitution did not provide for a village or

tribal court.

The full text reads:

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 6

CONSTITUTION
of the
Native Village
of
Dot Lake
--------------------

## PREAMBLE

We, the Tribal members of the Native Village of Dot Lake, Alaska having a traditional common bond, in order to promote our welfare through the development of governmental and economic enterprises, do establish this constitution.

## ARTICLE I – NAME

The name of this organization shall be The Dot Lake Village Council.

## ARTICLE II – DEFINITION OF TERRITORY

The area to be served and the jurisdiction of the council shall be in and around the native Village of Dot Lake. This area will include, but not limited to: USS 3217, USS 3123, USS 4285 in addition to lands transferred to the State of Alaska in trust under Section 14 (c) (3) of ANCSA, any lands transferred to the Village Council under Section 14 (c) (2) of ANCSA or acquired by the Village Council through other means, and lands included within the Dot Lake Native Corporation Shareholder's Subdivision.

## ARTICLE III - MEMBERSHIP

SECTION I:  TRIBAL MEMBERS

a.     All persons whose names shall appear on the Tribal Membership Roll as being members of the village shall be members of the Village.

b.     The Tribal Membership Roll shall contain the names of all surviving individuals that were listed as members of the Village under The Alaska Native Claims Settlement Act (ANCSA), to include their spouses and direct descendants.

SECTION II: NEW TRIBAL MEMBERS

a.     The direct descendents of any Tribal Member shall be included on the Tribal Membership Rolls.

b.     The Tribal Membership Roll shall be updated and certified at least once a year at the Village Annual Meeting to be conducted during the second quarter of each calendar year.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 7

Individuals will be responsible for noticing the Village Council of any change in family status which would affect the Tribal Membership Roll.

      c.     Any person, who becomes a resident of Dot Lake Native Village, may be adopted by the Council by a majority vote of the Tribal Members Present at a regularly called meeting of the Village Council, if the individual requests membership.

## ARTICLE IV – THE COUNCIL

SECTION I:  The Council shall be composed of a Chief/President, Second Chief/Vice President, Secretary and two members elected by the adult Tribal Members of the Village. Elections will be conducted at the Annual Village Meeting as required to fill vacancies on the Council. Any Tribal Member that has reached his/her eighteenth birthday shall be considered as an adult Tribal Member.

SECTION II: The Term of office for a council member shall be three years from the date elected (to the closest annual meeting).

SECTION III: The Village Council shall represent the village in all its undertakings and shall exercise the powers as enumerated in this Constitution.

## ARTICAL V – POWERS OF THE VILLAGE COUNCIL

SECTION I:  To do all things for the common good of the Village and/or the Tribal Members, which it has done or has had the right to do in the past and which is not against Federal or State Laws as they may apply.

SECTION II: To negotiate and/or contract with Federal and/or the tribal Members. To negotiate, contract, and/or deal with agencies, persons, firms, corporations, and/or municipalities on behalf of the Village and/or Tribal Members.

SECTION III: To provide for the filling of vacancies on the Village Council, consistent with this Constitution.

SECTION IV: To have authority over and control of Village owned and operated equipment, buildings, systems, land and/or services, and to insure that they are utilized for the good of the Village and its residents.

SECTION V: To control and Administer funds received from any equipment, buildings, systems, land and/or services, and to insure that they are utilized for the good of the Village and it's residents.

SECTION VI: The Council may exercise such other powers, not denied by Federal Law.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 8

## ARTICLE VI – CHANGE OF OFFICERS/MEMBERS OF THE COUNCIL

SECTION I:  Any Office or Member of the Council or other Official of the Village who is convicted of a felony or other offense involving dishonesty or moral turpitude shall be required to forfeit their office.

SECTION II: Any Officer of Member of the Council having missed two (2) unexcused absences from a properly noticed Council Meeting may be replaced by a majority vote of the other members of the Council.

SECTION III: If a position on the Council becomes vacant for any reason, the remaining members of the Council may appoint a successor to serve in that position until the next election.

## ARTICLE VII - AMENDMENTS

Amendments to this Constitution may be proposed by a resolution of the Council or by a Tribal Member. Amendments shall be effective when passed by the Village Council and shall remain in effect until the next Village Annual Meeting, at which time they must be ratified by the majority of the Adult Tribal Members present prior to becoming a part of this Constitution.

## ARTICLE VIII – DISSOLUTION

This Constitution shall continue in existence and remain in effect until dissolved by a majority vote of the adult Tribal Members of this Village, provided that at least (51) percent of those entitled to vote shall be present and vote.

## ARTICLE IX – ADOPTION

This Constitution shall be in effect upon agreement of the majority vote of the adult Tribal Members, voting in an election called for this purpose, provided that at least thirty (30) percent of the voting members are present and vote.

## CERTIFICATION OF ADOPTION

We, the undersigned Tribal Members of the Native Village of  Dot Lake, having been chosen to be election judges by the majority of the Tribal Members present, certify that we were present at meeting called for the purpose of adopting this Constitution on (hand written date of "3-Jan") 1986, that the foregoing was duly adopted at this meeting by a vote of (hand written number of "16") for and (hand written number of "0") against, and that at least thirty (30) percent of the adult Tribal Members were present and cast their ballots.

Signatures of:

Chairperson, Election Board

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 9

President, Dot Lake Village Council
Member, Election Board

Doc. Att. 11.

The Millers themselves never offered it to the BIA for review or approval. Dep. of W. Miller 42:1-4. The Village Council – as to whose powers and procedures, the constitution is silent – never adopted any ordinances until June 1, 2006. Dep. of W. Miller 54:11-14. The tribe never conducted any annual meetings under the 1986 constitution up and through September, 2006. Dep. of W. Miller 8:12-13; 22:5-14; 27:5-7.

The village population ranges from 45 to 71 tribal members;[2] but only one person, Gene Henry, was curious enough to actually attend what was called as the 2000 annual meeting; and he is the only person ever other than the Millers who can say that he attended an event called as a village "annual meeting." Dep. of W. Miller 8:1-5.

Under the constitution, only the village annual meeting had the authority to elect new members of the Village Council,[3] who have three-year terms. Without a single annual meeting of the tribe in twenty years under the 1986 constitution, there has never been a single Village Council member who can say that his or her authority derived from the tribe; in short, tribal democracy – under the 1986 constitution – hasn't existed.

The one and only Dot Lake Village Council meeting of any record occurred in 1996. Dep. of W. Miller 27:5-7. This is one meeting that can be documented of that body in 20 years. There was no Village Council meeting before the June 1, 2006 "Tribal Ordinance" was

---

[2] Dep. of W. Miller 32:20-25; 33:1-3; 27:11-16.
[3] Doc. Att. 11, Page 2.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 10

signed;[4] the "meeting" where the "village council" approved Ordinance 06-01-01 in "five to ten minutes".  Dep. of C. Miller 8:11-12.

But that's only the beginning, truly at the surface of what happened (or didn't happen, as it were) in the history of the 1986 constitution.  There were only two people who ever acted as the Village Council in the twenty year interval after 1986.  These were the Miller Defendants.  Dep. of W. Miller 43:10-20; Dep. of C. Miller 9:9-19.  Ordinarily they would point to an annual meeting, properly noticed, as the source of their authority to sit on the Village Council.  However, since there never was an annual meeting tribal meeting under the 1986 constitution – not a single one, not even one at which a quorum failed to appear, unless Gene Henry's appearance in the hallway counts for something – they had to disavow that source of authority.  Dep. of W. Miller 8:12-13; 22:5-14; 27:5-7.  Instead, both of the Miller Defendants said that they were on the Village Council because they were on the Council *before* the 1986 Constitution was "ratified."  "Q:  So Mr. Chuck Miller was on the tribal council before '86 as well…A:  Yes, sir."  Dep. of W. Miller 25:19-25.  "Q: [Y]ou and your father have authority to act for the council as two members of the council who were there before 1986 and have been there since 1986.  Is that correct?…A: Yes[ ]."  Dep. of C. Miller 9:9-19.

It's the functional equivalent of a member of the Continental Congress showing up in New York in 1789 and claiming a seat in Congress on the grounds that he was a member of a previous body of similar dignity, the Continental Congress; except that, to recognize such a member, one would have to declare the 1787 Philadelphia Convention and 1788 elections for Congress a nullity.  But that's exactly what the Millers did.  To repeat: "[Y]ou and your father have authority to act for the council as two members of the council who were there before 1986

---

[4] Dep. of W. Miller 7:14-25.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 11

and have been there since 1986. Is that correct?...A: Yes[ ]." Dep. of C. Miller 9:9-19. But that again is only scratching the surface as to their complete and total lack of authority to speak for the Village of Dot Lake.

The "Dot Lake Village Council" was symbolic only. It had no real powers to do anything: most importantly it didn't have any legislative powers. It couldn't pass ordinances and it didn't have requirements or procedures to notice their meetings; the Village Council lacked a quorum requirement, and there was no requirement that any number of Village Council members had to take affirmative action for a tribal resolution or ordinance to be valid.

The constitution lacked a requirement that records be kept of ordinances passed, resolutions adopted, or action taken, deferred or rejected. There were no provisions for special, regular, monthly, or annual meetings.

The Millers were quite honest about this, simply alluding to the "general welfare" provisions of the 1986 Constitution as the source of their authority.[5] When it was pointed out to them that tribal participation was lacking, they said that they attempted to revive such interest through surveys of tribal members. Doc. Att. 12.

The Village of Dot Lake is not a duly organized and recognized tribal village *with* a fully executed and approved tribal constitution. Neither the tribe nor the BIA nor Congress ever recognized the constitution. The 1986 constitution does not set out the lawmaking authority of Village Council; it has no power to adopt ordinances; it has no mechanics to adopt ordinances. This alone makes "Tribal Ordinance No. 06-01-01" a complete nullity. It would be useless to compare the ordinance to adoption procedures because there are none.

---

[5] Dep. of W. Miller 34:4-23

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 12

The Miller Defendants admitted and confirmed that all they did with the "Tribal Ordinance" that Mr. Walleri prepared on June 1, 2006 (according to his billing records) was to sign and fax it back in "five to ten minutes". Dep. of W. Miller 50:2-19; 54:3-10; Dep. of C. Miller 8:11-12. The Millers could not even say the machine was wrong when the fax banner indicated this "tribal action" happened in six to seven minutes because they didn't know how to use the fax machine. Dep. of C. Miller 8:22-25. "We basically have very few, if any, formal meetings." Dep. of W. Miller 8:12-13. "[I]s there any record of a tribal council meeting later than March 5th, 1996? Probably not a written record, no." Dep. of W. Miller 27:5-7. When there is no Village Council meeting of record for the *122 month* interval before the "tribal action" in question, then there is no "tribal action" that reflects any authorized activity in the name of the tribe.

Indeed, just as IRHA argued previously, the fax banner on the Ordinance shows that it was faxed out "From Walleri Law Office" at 13:10 p.m. on June 1st. Doc. Att. 1. The ordinance shows that it was signed on June 1, 2006 by two men who clamed authority to act on behalf of the tribe because they were on the Village Council *before the 1986 constitution came into* existence, whatever existence it can be said to have. The cover sheet for the reply fax (outgoing from the Dot Lake Village Council) on 13:16 p.m. and is also on June 1, 2006. Doc. Att. 16. Pages three and four (the last two pages of the Ordinance) show the fax banners clearly and indeed, there is a six minute interval for tribal lawmaking on page 3 with a seven minute interval on page 4.[6]

Moreover the "Tribal Ordinance" itself claims (in its preamble) that "the Village Council for the native Village of Dot Lake is the governing body of the Native Village of Dot

---

[6] Other inconsistencies are also of interest.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 13

Lake, a federal recognized tribal government." To be charitable, this is wildly misleading. As developed in the Chronology below and the documents above, on September 16, 1994, the Bureau of Indian Affairs in correspondence expresses concern that the Native Village of Dot Lake may not be eligible to organize under the IRA for lack of a "traditional common bond" as required by the 1936 amendments to the IRA. Doc. Att. 5. On June 3, 1995 the Village of Dot Lake rejected ratification of the 1995 version of the Constitution of the Native Village of Dot Lake by vote of 6 for and 17 against. Doc. Atts. 13, 14. On August 8, 1995 the Bureau of Indian Affairs has acknowledged the rejection of the proposed 1995 Constitution. Doc. Atts. 13, 14.

In short, there is no evidence that the BIA, or Congress or the people of Dot Lake ever did anything to recognize the Village Council under the 1986 Constitution as authorized to take any action for them.

What happened was exactly what IRHA contended: this is probably the most egregious case of lack of tribal official authority seen in any federal lawsuit in the last century: a lawyer is the scrivener of "tribal law" (which he admitted in state court) and the Miller Defendants deploy nothing more official than the office fax machine for their effort in signing what he sent to them. Mr. Walleri arranged for the Miller Defendants to be standing by, so that when his "Tribal Ordinance" arrived by fax, they would be in the office and ready to sign and fax the "Tribal Ordinance" back to him and that was the extent of their involvement with the so-called "Tribal Ordinance."

B.      The chronology of events pertinent to this action is as follows:

June 18, 1934          Congress passes the Indian Reorganization Act ("IRA"), 48 Stat. 984.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 14

| | |
|---|---|
| May 1, 1936 | Congress amends the IRA with the Alaska Indian Reorganization Act, 49 Stat. 1250, to allow Alaska Native villages to get the benefit of the IRA if they were organized before that date. |
| 1974: | IRHA is organized pursuant to AS 18.55.996. |
| December 18, 1971: | Congress passes the Alaska Native Claims Settlement Act ("ANCSA"), 85 Stat. 688. |
| January 3, 1986: | Sixteen members of the Native Village of Dot Lake vote to ratify the "Constitution of the Native Village of Dot Lake," a constitution which was never in effect and never submitted to BIA.  Doc. Att. 11. |
| May 20, 1988: | Supreme Court of Alaska in *Native Village of Stevens v. Alaska Management and Planning*, 757 P.2d 32 (Alaska 1988) holds that Alaska Native "tribes" do not have tribal sovereignty because Congress has never recognized them as such.  *Id*. at 41. |
| August 16, 1988: | Village Council of Dot Lake approves Resolution No. IRA-88-2, which indicates the desire of the Native Village of Dot Lake to organize pursuant to the provisions of the IRA.  Doc. Att. 5, Page 1. |
| November 1, 1988: | Congress amends the IRA to provide the Secretary of the Interior with guidance as to BIA review of tribal IRA constitutions and bylaws. |
| May 3, 1989: | Village of Dot Lake submits a proposed Constitution to the Bureau of Indian Affairs.  Doc. Att. 5, Page 1. |
| March 11, 1992: | Village of Dot Lake submits a proposed Constitution to the Bureau of Indian Affairs.  Doc. Att. 5, Page 1. |
| October 21, 1993: | Bureau of Indian Affairs publishes its first list of recognized tribes at 58 Fed.Reg. 54,364, 54,368-69 (1993).  Village of Dot Lake is on the list. *John v. Baker*, 982 P.2d 738, 749 (Alaska 1999). |
| September 16, 1994: | Bureau of Indian Affairs in correspondence expresses concern that the Native Village of Dot Lake may not be eligible to organize under the IRA for lack of a "traditional common bond" as required by the 1936 amendments to the IRA.  Doc. Att. 5. |
| November 2, 1994: | Congress passes the Federally Recognized Indian Tribe List Act, 108 Stat. 4791.  According to *John v. Baker*, this is congressional approval of the 1993 list, referenced above. 982 P.2d at 750. |

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 15

| | |
|---|---|
| June 3, 1995: | Village of Dot Lake rejects ratification of the 1995 version of the Constitution of the Native Village of Dot Lake by vote of 6 for and 17 against.  Doc. Atts. 13, 14. |
| August 8, 1995: | The Bureau of Indian Affairs acknowledges the rejection of the proposed 1995 Constitution.  Doc. Atts. 13, 14. |
| March 5, 1996: | First and last Village Council meeting.  Dep. of W. Miller 27:5-7.  No minutes of this meeting were made.  Dep. of W. Miller 8:2-4. |
| October 26, 1996: | Congress passes the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA"), 110 Stat. 4016. |
| October 1, 1997: | NAHASDA goes into effect. |
| January 19, 1998: | IRHA and Dot Lake Village Council enter into Lease Agreement for land underlying triplex.  Doc. Att. 15. |
| February 25, 1998: | U.S. Supreme Court in *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520 (1998) holds that Congress intended that ANCSA extinguished Indian country in Alaska. |
| 2000: | Dot Lake Village Council attempts to hold 2000 Annual Meeting; only 1 attendee appeared, Gene Henry in the hallway.  Dep. of W. Miller 7:25; 8:1-5. |
| August 22, 2003: | IRHA enters into Lease Agreement with Jason Corgill at triplex, who lists Barbara Almquist as a co-occupant of the property. Doc Att. 8.  Barbara Almquist is not a member of Dot Lake. |
| Fall/Winter 2004-2005: | Corgill moves out of the triplex, leaving Barbara Almquist as primary tenant. |
| October 4, 2004: | Dot Lake Village Council (i.e. William J. Miller and Charles P. Miller) passes Resolution 2004-10-04-04, authorizing the transfer of the Dot Lake triplex and house from IRHA to the Dot Lake Village Council, as IRHA cannot viably operate the triplex.  Doc. Att. 9. |
| October 27, 2004: | IRHA passes Resolution 04-27, "Resolution to Convey Dot Lake Triplex," authorizing the transfer of the Dot Lake triplex from IRHA to the Dot Lake Village Council.  Doc. Att. 10. |

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 16

| March 2, 2004 | Congress passed the Native American Technical Corrections Act of 2003, P.L.108-204, which amended the IRA to include 476(h) requiring tribal governing documents. |

January 1986-
September 2006:

Dot Lake fails to have a single annual meeting under the 1986 constitution. Only the Miller defendants claim authority to act for the Native village and only because they were on the Village Council before the 1986 constitution was adopted. Dep. of W. Miller 8:12-13; 23:20-25.

| January 13, 2006: | IRHA serves its Notice to Tenant of Termination of Tenancy pursuant to AS 34.03.290(b) upon Almquist.  Doc. Att. 20. |

| January 13, 2006: | IRHA serves its Notice to Tenant of Termination of Tenancy pursuant to 25 U.S.C. 4137 and lease agreement for good cause Doc. Att. 19. |

| February 21, 2006: | After Walleri files his entry of appearance, the Alaska Office of Native American Programs advises counsel for Barbara Almquist that IRHA is not in violation of NAHASDA by filing for FED.  Doc. Att. 10. |

| March 30, 2006: | Complaint for Forcible Entry and Detainer ("FED") filed in Case No. 4FA-06-1421 CI by IRHA against Barbara Almquist.  Doc. Att. 21. |

| May 10, 2006: | First day FED trial held. |

| May 18, 2006: | Second day FED trial held. |

January 2006-
May 31, 2006:

Dot Lake Village Council fails to hold any meeting in any capacity regarding the FED action against Barbara Almquist.

| June 1, 2006: | Atty. Walleri creates in one day the "Tribal Ordinance".  Doc. Att. 28, Pages 1-9. |

| June 1, 2006: | William J. Miller and Charles P. Miller sign names to Dot Lake Village Council "Tribal Ordinance 06-01-01," which was faxed "five to ten minutes." Dep. of W. Miller 54:3-10; Dep. of C. Miller 8:11-12.  There was no notice of this "meeting," no quorum, which is a violation of five member meeting requirement of the 1986 constitution.  Doc. Att. 1, Page 3. |

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 17

June 1, 2006:          Almquist files her Second Supplemental Bench Memorandum, where she asserts for the first time that Ordinance 06-01-01 prohibits IRHA from evicting Almquist. Doc. Att. 24.

June 5, 2006:          IRHA files its Response to Almquist's Second Supplemental Bench Memorandum.

June 7, 2006:          Almquist files her Reply to IRHA's Response to Almquist's Second Supplemental Bench Memorandum.

June 14, 2006:         Third Day FED hearing; District Court Judge Funk denies the FED due to the Dot Lake Village Council's passage of Ordinance 06-01-01: "The court is not going to grant the FED. [ ] I do find a legitimate business and economic interest in terminating the tenancy. [ ] [T]his court would have granted the FED had [ ] the tribal council [not] passed the ordinance. Doc. Att. 2, Pages 2, 3, 4.

June 26, 2006:         IRHA files its Motion for Reconsideration.

June 27, 2006:         The present federal action is filed by IRHA against Almquist, Village of Dot Lake, William and Charles Miller and John Does 1-3 in Case No. 4:06-CV-00018 RRB by IRHA.

July 6, 2006:          Almquist files her Cross-Motion to Dismiss in Case No. 4:06-CV-00018 RRB.

August 28, 2006:       This Court grants IRHA's Motion for Rule 56(f) Continuance in Case No. 4:06-CV-00018 RRB, thereby ordering record to be made on tribal officials scope of authority to sign "Tribal Ordinance 06-01-01."

## IV.    ARGUMENT: 1986 IS NOT A GOVERNING DOCUMENT UNDER 25 U.S.C. Sec. 476.

The story of the Indian Reorganization Act begins for our purposes with John Collier and the other New Deal era reformers who sought to revive tribal governing structures through the Indian Reorganization Act (IRA) of 1934. The provision permitting such tribal organization is presented in 25 U.S.C. Sec. 476a, which provides as follows: "Any Indian tribe shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, and any amendments thereto, which shall become effective when-- (1) ratified by a

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 18

majority vote of the adult members of the tribe or tribes at a special election authorized and called by the Secretary under such rules and regulations as the Secretary may prescribe; and (2) approved by the Secretary pursuant to subsection (d) of this section." With regard to Alaska Natives, the IRA was amended in 1936 to include

> groups of Indians in Alaska not recognized prior to May 1, 1936 as bands or tribes, but having a common bond of occupation, or association, or residence within a well-defined neighborhood, community or rural district, may organize to adopt constitutions and by-laws and to receive charters of incorporation and federal loans under [sections of the Indian Reorganization Act of 1934].

In 1988, the IRA was amended by Congress with P.L. 100-581 (102 Stat. 2938), which provided the Secretary of the Interior with guidance as to review of tribal constitutions and bylaws submitted pursuant to the IRA. In 1994, Congress passed the Federally Recognized Indian Tribe List Act, 108 Stat. 4791, which directed the Secretary of the Interior to publish "a list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians." However, the first list of federally recognized tribes was published in 1993 at 58 Fed.Reg. 54,364, 54,368-69 (1993). *John v. Baker*, 982 P.2d 738, 749 (Alaska 1999). In 2003, Congress passed the Native American Technical Corrections Act, which amended the IRA to include the following section:

> SEC. 103. TRIBAL SOVEREIGNTY. Section 16 of the Act of June 18, 1934 (25 U.S.C. 476), is amended by adding at the end the following: "(h) TRIBAL SOVEREIGNTY.--Notwithstanding any other provision of this Act--"(1) each Indian tribe shall retain inherent sovereign power to adopt governing documents under procedures other than those specified in this section; and "(2) nothing in this Act invalidates any constitution or other governing document adopted by an Indian tribe after June 18, 1934, in accordance with the authority described in paragraph (1).".

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 19

As the court can see from the documents in the record submitted, the deposition testimony of William Miller, there is no documentation of any tribal approval of the 1986 constitution by a "majority" of tribal members; nor is there any follow-on participation after 1986 that would breath life into that constitution; and the only role in this matter the BIA has assumed is to develop another constitutional document which would be entirely unnecessary if the 1986 had any force, on anyone's account.

## IV.    ARGUMENT – THIS COURT HAS FEDERAL QUESTION JURISDICTION OVER COUNT I.

A.    Introduction

When a plaintiff pleads a colorable claim arising under the federal constitution or federal statute, the plaintiff has properly invoked 28 U.S.C. Sec. 1331.  *Bell v. Hood*, 327 U.S. 678, 681-85, 66 S.Ct. 773, 775-77 (1946).  In numerous cases, in Alaska and in Ninth and Tenth Circuits, federal courts have followed the lead of the U.S. Supreme Court in recognizing claims for relief by non-tribal owners of property and business interests in disputes with tribes and also ordering that these disputes present federal questions under 28 U.S.C. Sec. 1331.  The only real issues in developing this doctrine arose over the requirement of exhaustion of tribal court remedies; irrelevant here because the 1986 constitution does not provide for any functioning organ of government, regulatory or adjudicatory.

B.    Claims Arising Under Federal Law Create Federal Jurisdiction: *National Farmers Union Insurance Companies v. Crow Tribe of Indians*.

In *National Farmers Union Insurance Companies v. Crow Tribe of Indians*, 471 U.S. 845, 105 S.Ct. 2447 (1985), an Indian minor was injured in the parking lot of a public elementary school located on state land within the Crow Indian Reservation.  The boy sued the

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 20

Crow Tribe in Tribal Court and obtained a default judgment against the school district. The school district sued the Tribe in federal court and the Tribe asserted that the federal court had no jurisdiction over the matter. The Supreme Court held that "in order to invoke a federal district court's jurisdiction under § 1331, it was not essential that the petitioners base their claim on a federal statute or a provision of the Constitution. It was, however, necessary to assert a claim "arising under 'federal law.'" 471 U.S. at 850.

The federal question issue involves an inquiry into whether the tribal court had exceeded the limits of its powers in a dispute with non-tribal members. If there is a functioning tribal court, the non-Indian business will have to go through tribal court and exhaust remedies there; but this loops back to the question of whether the tribal officials had authority to take the action that they did. *National Farmers* gave tribal actors an opportunity to conform their behavior, both to tribal and federal law, before and in the litigation in federal court; however, it also did not require a *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080 (1975) analysis – where's the statute authorizing your private cause of action? – and said so explicitly. "[I]n order to invoke a federal district court's jurisdiction under § 1331, it was not essential that the petitioners base their claim on a federal statute or a provision of the Constitution." 471 U.S. at 850.

*National Farmers* followed *Montana v. U. S.*, 450 U.S. 544, 101 S.Ct. 1245 (1981), where the Court held that, when tribal jurisdiction over nonmembers is challenged, federal question jurisdiction is thereby invoked. In *Montana v. U. S.*, the Court held that

> the inherent sovereign powers of an Indian tribe do not extend to the activities of
> nonmembers of the tribe. To be sure, Indian tribes retain inherent sovereign
> power to exercise some forms of civil jurisdiction over non-Indians on their
> reservations, even on non-Indian fee lands. A tribe may regulate, through
> taxation, licensing, or other means, the activities of nonmembers who enter
> consensual relationships with the tribe or its members, through commercial

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 21

dealing, contracts, leases, or other arrangements.   A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. *Id*. at 565-66

In turn, *Montana v. United States* had quoted with approval in *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 102 S.Ct. 894 (1982) [tribal and gas severance tax upheld], and glossed as follows: "The Court has emphasized that 'exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.'" *Id*. at 171.  (citing *Montana v. United States*, *supra* at 22).

     C.     Federal Court Elaboration upon *Montana, Merrion* and *National Farmers*.

The paradigm has guided federal courts since then: tribal power over non-member business interests is a given; tribes wouldn't have sovereignty if they didn't have such power. However, the exercise of this power in specific cases can be challenged in federal court and declaratory and injunctive relief sought, even, as in *National Farmers*, to undo tribal action, such an ordinance or judgment.[7]

As federal courts have had occasion to interpret the extent to which tribes may regulate business activities on reservations with entities that have *or lack* federal rights that they exercise on their own.  In *Superior Oil Company v. United States*, 798 F.2d 1324 (10th Cir. 1986), the Tenth Circuit Court of Appeals held that, "in cases encompassing the federal question whether a tribal court has exceeded its lawful limits of jurisdiction involving an exercise of civil subject-

---

[7] True, when tribal courts are operational and resort would not be futile, the non-member must challenge tribal court power over its business interests in tribal court first and exhaust such remedies.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 22

matter jurisdiction in a case such as that presented here, the federal district court is empowered to review a tribal court decision under 28 U.S.C. Sec. 1331." *Id*. at 1329.

Tribal actors in the Navajo Tribe intentionally withheld approvals of assignments and seismic requests in order to force re-negotiation of oil and gas leases, according to the non-member, Superior Oil; much the same situation had come before the Tenth Circuit in *Tenneco Oil Company v. Sac and Fox Tribe of Indians of Oklahoma*, 725 F.2d 572 (10th Cir. 1984). There the Court of Appeals held that:

> [i]f the sovereign did not have the power to make a law, then the official by necessity acted outside the scope of his authority in enforcing it, making him liable to suit.  Any other rule would mean that a claim of sovereign immunity would protect a sovereign in the exercise of power it does not possess.  *Id*. at 574.

The *Tenneco Oil* court had occasion to observe the close relationship between the judicial parsing of federal question and scope of authority issues.

> The presence or absence of federal question jurisdiction is to some extent tied to the sovereign immunity issue.  In a recent case construing the Foreign Sovereign Immunities Act, 28 U.S.C. § 1330, the Supreme Court observed that in cases involving a sovereign other than the United States "the primacy of federal concerns is evident" because of Congress' plenary power over foreign relations. The analogy to Indian law is clear.  It was recognized early that Congress had plenary power to determine relations with the Indian tribes and the extent of Indian sovereignty over non-Indians.  An inquiry into whether Congress has in fact limited tribal sovereignty in a given case necessarily triggers federal concerns.  *Id*. at 575.

And it's this simple: there is no reason why Congress should have to create or recognize a class of business owners who deal with tribes and stamp "potential federal plaintiffs" on their respective foreheads.  Each and every business owner whose property rights are affected by tribal action or inaction, well or ill-motivated, has a right to proceed to federal court, subject to the exhaustion loop, required if a tribal court exists, excused if there is no tribal court or resort

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 23

would be futile, *and then* that business owner meets the real hurdle in his suit.[8]  Hence, just as the *Tenneco Oil* court implied, the plaintiff who perfectly stacks all of his Legos™ to get himself in shape to make a federal question of his suit, on the other hand, may well have built a sovereign immunity defense for the tribe in the same effort.  And Hardin is a man who did exactly that.

The Ninth Circuit has made this point crystal clear by issuing dicta in *Hardin v. White Mountain Apache Tribe*, 779 F.2d 476 (9th Cir. 1985), that make that case on all fours with *National Farmers* and other business owner/tribal commercially based disputes.  Hardin was no businessman, unless you count stealing "solar panel cells and batteries" as an occupation. Hardin had no business (or "consensual commercial") connection with the tribe, unless you assume that his parents' ground lease of tribal land created such a relationship.  He was a troublemaker, born or bred, and he got banished from the reservation.

The Ninth Circuit was not content to allow the case such a narrow focus, the right and duty of the tribe to keep thieves from stealing tribal property:

> When a nonmember has entered into a consensual commercial relationship with the Tribe or its members the Tribe retains inherent power to exercise civil authority over the conduct of the nonmember on fee lands within its reservation. A tribe has power to place conditions on entry, on continued presence, or on reservation conduct.  A nonmember who enters the jurisdiction of the tribe remains subject to the risk that the tribe will later exercise its sovereign power. The ordinance in question is just such a regulation of a nonmember's reservation conduct." *Id*. at 479.

---

[8] This point can be elaborated further.  If Congress were called on to define tribal sovereignty over non-members' business interests, that effort would be in derogation of sovereignty itself.  Congress – letting *National Farmers* stand as good jurisdictional law – has left the interesting part of the analysis in these cases to tribal leaders' scope of authority under *Ex Parte Young*, especially when the business owner wants injunctive relief against tribal actors.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 24

But that is not all that the Ninth Circuit did.  The court made the dismissal turn on tribal sovereign immunity and Hardin's failure to make a scope of authority case to overcome *that* hurdle.

> Sovereign immunity shields the Tribe from any suit arising out of the proceeding.  This tribal immunity extends to individual tribal officials acting in their representative capacity and within the scope of their authority.  Because all the individual defendants here were acting within the scope of their delegated authority, Hardin's suit against them is also barred by the Tribe's sovereign immunity.  779 F.2d at 479-80.

As noted above, this analysis preceded by some weeks *National Farmers* which reversed another panel of the Ninth Circuit for not granting injunctive relief to business entities beleaguered by litigation advantages wrongfully obtained and used against them.  For IRHA's purposes, it is sufficient only to quote this sentence, to make the cognizable claim for relief and federal question points in this part of IRHA's brief:  "The Tribe's ordinance [banishing Hardin] is totally dependent on United States law for determination of virtually all relevant issues of law and fact."'  *Id.* at 479.  It hardly bears repeating that a "Tribal Ordinance" which is based on, interprets and quotes from federal law such as 25 U.S.C. Sec. 4137 is also an "ordinance … totally dependent on United States law for determination of virtually all relevant issues of law and fact."  *Id.*

*Hardin* relied on both *Merrion* and *Montana* which guided the Ninth Circuit to the correct result.  These are the leading authorities that establish a federal cause of action in a commercial consensual relationship between a tribe and a non-member over a business interest, whether the scope of relief that is sought is monetary damages or injunctive relief.  If it is injunctive relief, then the *Ex Parte Young* standard applies for obtaining injunctive relief to restrain the tribe from taking action to violate the plaintiff's rights.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 25

The law in the Ninth Circuit is clear, based on the dicta in *Hardin*, supra, and *Chilkat Indian Village v. Johnson*, 870 F.2d 1469 (9th Cir. 1989). Non-tribal members who have business relationships that give rise to disputes with tribes have cognizable claims for relief and can invoke federal question jurisdiction; but if they want relief – as in rolling back tribal action – they have to be able to show tribal officials acting outside the scope of their authority. And over 21 years ago, the Supreme Court had already pointed out that "bad faith" of tribal actors would suffice to trigger the *Ex Parte Young* stripping of tribal sovereign immunity. 471 U.S. 865 at FN. 21.

> D.    Tribal Exhaustion Doctrine in Action: *Burrell v. Armijo*.

Take the Tenth Circuit's decision in *Burrell v. Armijo*, 456 F.3d 1159 (10th Cir. 2006): the Burrells (non-Indians) had a contract with the Santa Ana Pueblo Tribe. His beef with the tribe results, on his account, with the Tribe Burrells off their farm (located on the Pueblo Reservation), stealing the Burrells' crops, and so forth. At 1162-63. The federal court dismissed the suit, holding that Burrells failed to exhaust tribal court remedies. On appeal, the Tenth Circuit observed that "[t]ribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians." 456 F.3d at 1167. The *Burrell* court further observed as follows:

> The Supreme Court, citing the promotion of tribal self-government and principles of comity (as opposed to a jurisdictional prerequisite), has required litigants to exhaust their tribal court remedies before a district court may evaluate the existence of a tribal court's jurisdiction. This exhaustion policy provides a tribal court the first opportunity to examine its own jurisdiction, but is subject to the following exceptions: (1) where an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith; 2) where the tribal court action is patently violative of express jurisdictional prohibitions; (3) where exhaustion

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 26

would be futile because of the lack of an adequate opportunity to challenge the tribal court's jurisdiction; (4) when it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by the main rule established in *Montana v. United States*; or (5) it is otherwise clear that the tribal court lacks jurisdiction so that the exhaustion requirement would serve no purpose other than delay.    Allegations of local bias and tribal court incompetence, however, are not exceptions to the exhaustion requirement.    After exhaustion is completed, litigants may seek federal court review of a tribal court's ruling that it had jurisdiction.    But unless the district court finds the tribal court lacked jurisdiction or withholds comity for some other valid reason, it must enforce the tribal court judgment without reconsidering issues decided by the tribal court.  *Id.* at 1168.  (citations omitted)

The tag line "where an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith" is itself a quote from and citation to Justice Stevens's opinion in *National Farmers*, *supra*, 471 U.S. at 857, n. 21 (1985)  It would certainly come as a surprise to the federal judges on the circuit courts and the Supreme Court that the Defendants in this case can escape analysis of their conduct since it clearly did arise from a "desire to harass or [was] conducted in bad faith."   The Miller Defendants have never had any pedigree for any official conduct in twenty years *and then* they sign a faxed "Tribal Ordinance" in a few minutes.

It's worth pointing out that *Cort v. Ash*, 422 U.S. 66 (1975) analysis is not resorted to in these cases; in short, tribal actors who assert power over non-member business interests are always subject to challenge when they tread on the rights – federal or otherwise – of these business owners *and* their bad faith and desire to harass is not only a part of resolving the threshold federal question issue but also the ultimate issue as to whether the tribal actors and tribe can be sued for injunctive relief, based on *Ex Parte Young* principles. There's a lesson in here about why *Cort v. Ash* doesn't fit in caselaw of the dignity of *Montana*, *Merrion*, *National Farmers* or (at the circuit level) *Superior Oil*, *Tenneco* or *Burrell*.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 27

And it's this simple.  There is no reason why Congress should have to create or recognize a class of business owners who deal with tribes and stamp "potential federal plaintiffs" on their respective foreheads, as argued above.

E.    Private Rights of Action under Federal Statutes and the *Cort* Analysis.

In *Solomon v. Interior Regional Housing Authority*, 313 F.3d 1194 (9th Cir. 2002), an Alaska Native employee was injured on the job, quit and was replaced by a non-Native.  The employee sued IRHA, claiming it had violated the hiring preferences afforded by the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450e.  The Ninth Circuit analyzed whether or not Congress had intended for 25 U.S.C. § 450e to provide a private right of action, using the criteria set out in *Cort v. Ash*, 422 U.S. 66 (1975).  In its analysis of the *Cort* criteria, the Solomon court held that "Congress did not create a direct private right of action under 25 U.S.C. § 450e for an Indian job applicant when a non-Indian is hired instead of the applicant.  Rather, the applicant must resort to those remedies established by the terms of the contract or grant itself." *Id*. at 1201.  Accordingly, in *Oliver v. Sealaska Corp.,* 192 F.3d 1220 (9th Cir. 1999), the Ninth Circuit addressed whether Congress had intended for the Alaska Native Claims Settlement Act ("ANCSA") to provide a private right of action.

F.    Tribal Ordinances, Internal Affairs, and Federal Questions: *Chilkat Indian Village v. Johnson.*

Federal courts will not review challenges to certain well defined tribal action because, as the rubric goes, federal courts are reluctant to exercise "[j]urisdiction to resolve internal tribal disputes, interpret tribal constitutions and laws, and issue tribal membership determinations lies with Indian tribes and not in the district courts." *In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litigation*, 340 F.3d 749, 764-765 (8th Cir. 2003).  This proposition is

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 28

cited in *Quair, infra*. Similar circuit authority may be found in *Runs After v. United States,* 766 F.2d 347, 352 (10th Cir. 1985). These decisions typically arise under the Indian Civil Rights Act. *Kaw Nation v. Norton*, 405 F.3d 1317, 1324-25 (Fed. Cir. 2005).

The federal courts have made matters as clear as they possibly could. Inter-tribal disputes including membership issues, and disputes arising under the Indian Civil Rights Act fall under their own caselaw in which Congress is deemed to be reluctant to recognize claims for relief and jurisdiction under 28 U.S.C. Sec.1331. *Solomon* and *Oliver* follow their own path in which the courts are willing to look for legislative intent as to whether "private rights of action" exist, but of course neither of those plaintiffs were doing business with tribes. IRHA has pointed out that it has its independent status as a federal actor; this is simply frosting on the cake and would, independent of the authorities cited for tribal-business disputes, justify federal jurisdiction because IRHA's rights under 25 U.S.C. Sec. 4137(a)(5) have been violated.

(IRHA incorporates its argument as to *Chilkat* from its memorandum in support of its Motion for Rule 60(b) Relief and refers the court and parties to that discussion.)

## V.    ARGUMENT: TRIBAL SOVEREIGN IMMUNITY DOES NOT BAR SUITS AGAINST TRIBAL OFFICERS ACTING BEYOND THE SCOPE OF THEIR AUTHORITY.

There are two perspectives on the ultimate legal issue(s) in this suit:

Is the 1986 Constitution of the Native Village of Dot Lake (Doc. Att. 11) offered in the William Miller and Charles Miller depositions as a "governing document" as contemplated by Congress under Sec. 476 and subsections (a) and (h) which would authorize the Miller Defendants to enact tribal law?

and,

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 29

Can Defendants William Miller and Charles Miller trace their authority to sign "in five or ten minutes" the faxed "Tribal Ordinance," as drafted by Mr. Walleri (Doc Att. 1), to the 1986 Constitution?

Federal courts are not reluctant to say *what is* and *what is not* a governing document or a valid constitutional amendment; just as, under *Ex Parte Young*, 209 U.S. 123 (1908), they are not reluctant to say that a given tribal individual lacks the pedigree for her action, is not acting within the scope of her authority and therefore a suit against her does not implicate tribal sovereign immunity. Most of the decisional law in the area makes so much sense that it would be amazing that anyone would ever conceive that three people signing a "constitution" in 1986 are authorizing "ordinance by fax" twenty years later.

We begin with *Miwok: California Valley Miwok Tribe v. United States,* 424 F.Supp.2d 197 (D.D.C. 2006). It's about money and power in a small tribe, so small that a very few members can attempt to seize power: "'When someone says it's not about the money,' according to H.L. Mencken, "it's about the money.'" *Id*. at 203 n. 7. The key phrase "notice, a defined process and minimal of tribal participation" appears in the *Miwok* case and informs that court's reading of Sec. 476(h). A small group of Indians – with a lot of money at stake – attempted to form a tribal government, first with some very few (but unnumbered family members) and then relented to allow membership to constitute 29 members, when a total of 250 might be considered for membership. *Id*. at 202-203.

The minority's litigation goal was to get the federal courts to approve their tribal regime and profit when tribal resources and profits were to be distributed. The claim was dismissed. The losing argument was that Sec. 476(h) shielded minority take-overs because anything

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 30

offered as a "governing document" by anyone in the tribe must be taken at face value by the courts. Moreover, because IRA constitutions (and their BIA approvals) were governed by Sec. 476(a), Congress must have meant to give free rein to any tribe to adopt non-BIA-approved constitutions under 476(h) without any judicial or administrative oversight. Counter to this agreement, the federal court insisted that the BIA had a duty to supply oversight to achieve full participation of tribal members. *Id*. at 202.

*Miwok* is an example of Potter Stewart's famous dictum in action: what the very few tribal members had done to create a government simply didn't look like tribal democracy in action. There wasn't substance enough for the federal court to dignify the minority's efforts unless the tribe itself could be seen as behind the push to get organized and adopt governing documents that were truly going to govern them. What was at stake was the same evil that haunts this case: "representatives faithless to their own people [with "governing documents" approved as such] would be a clear breach of the Government's fiduciary obligation." *Id*. at 202. Honest tribal leaders are looking for maximum participation to share tribal benefits as widely as possible and the fiduciary duty to share the wealth and spread tribal democracy go hand-in-hand. The government no less than federal courts share the obligation to ensure that tribal democracy is in action, when a "tribal ordinance" is offered in court proceedings.

*Miwok* instructs the reader that Sec. 476(h)'s references to "governing documents adopted by a tribe" must be understood as references to documents that have been "ratified by a majority vote of the adult members," as required by subsection 476(a). Subsection 476(h) did not repeal the provisions of subsection 476(a), nor will it be construed to repeal or water down the protections afforded by the IRA. What the court did was to construct a parallel regime of

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 31

judicial approval for tribal governing documents so that when tribes organize these criteria must be met: "notice to the tribal members, a defined process for constitutional organization and minimum levels of tribal participation." *Id*. at 202-204.

This is not a new exhortation, federal courts urging tribal leaders, tribes and the BIA onward to make tribal democracy work.  A quarter century before *Miwok* the District of Columbia Court of Appeals had occasion to rule that "full and fair participation of tribal members is critical to the legitimacy of any constitutional reform." *Morris v. Watt*, 640 F.2d 404, 415 (D.C. Cir. 1981).  [finding there was a "general failure on the part of the Choctaw and Chickasaw governments to allow the tribal members to decide basic questions concerning any fundamental changes" to the Tribal Constitutions].

In general, federal courts understand that the adoption of whole constitutions and, on the other hand, specific amendments implicate their jurisdiction.  Take, for instance, *Seminole Nation of Oklahoma v. Norton*, 206 F.R.D. 1 (D.D.C. 2001)[merits of constitutional amendments at issue; amendments defined tribal membership given previous treaties and code law before court].

Congress itself frequently puts judicial analysis of "governing documents" in motion – not just in Sec. 476(h) governing documents – but also in specific subject matter areas, such as the Indian Child Welfare Act ("ICWA").  In *Doe v. Mann*, 285 F.Supp.2d 1229 (N.D. Cal. 2003), section 1918 of ICWA, 25 U.S.C. § 1912 *et seq*., was construed so that tribes might reassume child custody cases but only under their own tribal constitutional provisions.  *Id*. at 1238-39.  Not just any scrap of paper may be offered for its constitutional dignity; there must

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 32

be a governing document that meets, under ICWA, Congress's specific standards for a tribal commitment to take on the job of judging custody disputes on terms acceptable to Congress.

Take also *Bugenig v. Hoopa Valley Tribe*, 266 F.3d 1201 (9th Cir. 2005), where the court engages in an analysis of the validity of a tribal ordinance given the respective tribal constitutional provisions offered as a basis for the approval of the Commissioner of Indian Affairs. *Id*. at 1215-16. To fast forward, *Bugenig* alone condemns Dot Lake Tribal Ordinance 06-01-01 – an ordinance by fax – because it has no constitutional source for its authority, unlike *Bugenig* where "the Tribe had the power to pass the ordinance that affected [Bugenig's] logging activity on her fee land with in the borders of the Reservation." *Id*. But there is more.

In *Bugenig*, the Ninth Circuit spelled out, with implicit approval, how a tribal constitution would go about vesting authority to act in a tribal governing council.

> The second provision on which the Tribe relies is Article IX(1)( / ). Article IX sets out the 'powers' of the Hoopa Valley Business Council. Section 1( / ) grants the Council the power to safeguard and promote the peace, safety, morals, and general welfare of the Hoopa Valley Indians by regulating the conduct of trade and the use and disposition of property upon the reservation, provided that any ordinance directly affecting non-members of the Hoopa Valley Tribe shall be subject to the approval of the Commissioner of Indian Affairs[.] *Id*. at 1214.

As the Ninth Circuit concluded: "That provision [of the tribe's constitution] unambiguously contemplates tribal regulation of the use of property upon the reservation, even if the regulation affects 'non-members.' Plaintiff acknowledges that Article IX(1)( / ) refers to non-members as individuals, but notes that it does not refer to non-members' fee lands." *Id*. at 1215. Rather obviously, the Ninth Circuit concluded that the Tribal business council could write ordinances affecting non-members in the use and disposition of property upon the

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 33

reservation and it is this level of specificity in constitutional drafting which met with the Ninth Circuit's approval.

In *Ransom v. Babbitt,* 69 F. Supp. 2d 141 (D.D.C. 1999) the constitution as an act of the minority followed by participation of a majority – the will of the tribe – comes into play. Here, a dispute over the adoption of a new constitution implicated the viability of the existing tribal constitution; the 51% approval requirement for adoption was discussed in some detail by the federal court as a prelude to enforcing this instance of a "governing document".[9]  *Ransom* makes the obvious obvious: a governing document that is truly governing governs not only the behavior of tribal actors but is also binding on the BIA – because it has been approved and/or it has the dignity that the BIA and federal court give it under Sec. 476(a) – and it governs federal court resolution of disputes that implicate provisions of such governing documents.

What was pivotal in *Ransom* was "the simple fact that 51% of the voters in the Tribal referendum did not choose to adopt the Constitution, the very language of the Tribal Court decisions should have given Defendants pause before they adopted that Court's findings as federal policy."  *Id*. at 152.  The *Ransom* court further held:

> Like the Defendants, courts take care not to intervene into internal tribal affairs. [I]t would be highly anomalous in a case in which the underlying claim is one of self-determination for the Court to vindicate that right by simply mandating the creation of some particular sort of institution of government.  Further, if the legitimate tribal institutions are no longer functioning or are no longer able to fulfill their duties, the power to make such important determinations for the tribe in question lies with the people of the tribe-not with the federal government. [ ] [C]onsent for fundamental political decisions may only be obtained from the ultimate source of legislative authority, the people themselves···· [A] feasible and appropriate approach would be to consult the members of the tribe directly, by means of a referendum.  *Id*. at 150. (citations omitted).

---

[9] See discussion earlier where a majority of the tribe did not have a role in approving the constitution because those willing to sign the constitution itself certified only that at least 30% were in attendance.  Indeed, William Miller even insisted that non-Indians could participate in this tribal government.  Dep. of W. Miller 21:8-17.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 34

A tribal constitution, as a matter of law, is not a document discovered in a file and brought to a deposition with three signatures that never grew out of the expression of tribal will, was adopted as a tribal act, at a point in time of tribal will and thereafter was in use as a governing living, breathing constitutional guide to accomplishment of the goals of the tribal membership.

Federal courts have gone to great lengths to define the scope of authority of legitimate, duly elected tribal officials. See, e.g., *Village of Hotvela Traditional Elders v. Indian Health Services*, 1 F.Supp.2d 1022, 1027 (D.Ariz. 1997)[Tribal Defendants' actions, rendered on behalf of all Hopi members and, more specifically, the Village of Hotevilla, "seem to be well within the power set forth in the Hopi Constitution. Any further analysis would require interpretation of Hopi law, and this court declines to do so."]; *Gavle v. Little Six, Inc.*, 2000 WL 16320 (Minn.App. 2000)[tribal immunity extends to tribal officials acting within the scope of their authority and in a representative capacity, but concluded that whether Ross is immune from suit depends on the resolution of a fact question. Thus, left for trial was the question of whether Ross was acting in a representative capacity when she engaged in the activities challenged]; in *Turner v. Martire*, 99 Cal.Rptr.2d 587 (Cal.App. 2000)["Defendants have cited no decision, and we are aware of none, holding that the term "tribal officials" applies to such individuals, without regard for the nature of their official positions or duties. On the contrary, the decisions recognizing immunity of tribal officials typically involve individuals who clearly occupied a discretionary or policymaking positions." *Id*. at 592].

The Miller defendants cannot possibly claim to be "defendants perform[ing] discretionary or policymaking functions within or on behalf of the Tribe" when they signed the

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 35

Dot Lake "Tribal Ordinance" that Mr. Walleri faxed to them on the day a brief was due in a

state FED proceeding.  But there are plenty of nitty-gritty cases in which lapses in procedures

in tribal governance have voided tribal action.  The case that is most on-point is *Quair v. Sisco*,

359 F.Supp.2d 948 (E. D. Cal. 2004): "since the resolution did not meet the formal

requirements for tribal action, i.e., it was not signed, the ordinance was invalid on its face,

which were specific requirements under the 'Articles of Community Organization'." *Id*. at

979-980.

The *Minchumina* case now draws our attention: *Minchumima Natives, Inc. v. Dept. of*

*Interior*, 394 F.Supp.2d 1145 (D. Alaska 2005).  This case, the tribal council – as a governing

body – must be able to explain to a federal court the coherence, as a formal matter, between the

entity whose rights the tribe seeks to litigate in federal court *and* the entity that is recognized by

Congress.

> There is another reason why MNI may not pursue the pending action. Simply
> stated, MNI is not the entity whose rights it would have the court adjudicate.
> MNI-that is Minchumina Natives, Inc.-made no application for a land
> conveyance. The application was made by a different corporation named
> Minchumina Natives Incorporated. The difference is more substantial than a
> slight variance between similar names. MNI is a non-profit corporation which
> was organized under the state's non-profit corporation statute in December 2004.
> Minchumina Natives Incorporated, the entity which applied for a conveyance of
> lands to a Native Group under ANCSA, was a business corporation organized in
> 1975 under a different state statute. MNI still exists. Minchumina Natives
> Incorporated does not. *Id*. at 1149.

To fast forward here, the Miller Defendants claim to be acting under the 1986

constitution; that constitution says the entity is called "The Dot Lake Village Council",[10] but

there are no means provided whereby such a council can notice out its meetings, take action by

---

[10] At Article I: "The name of this organization shall be the Dot Lake Village Council."  Doc. Att. 11, Page 1.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 36

a quorum of its members, or take affirmative action of a majority of that quorum.  There is no requirement that the Council ever meet and the Council has no authority to adopt ordinances.[11]

But that's not *Minchumina*'s point, a government that claims – in federal court litigation -- that it is the recognized entity needs to be ready to prove up its pedigree.  Here the tribe is known officially as of 1993 as the "Village of Dot Lake."  58 Fed.Reg. 54,364, 54,368-69 (1993).

*Minchumina*'s point is this: it doesn't matter whether MNI is run by the same people who started Minchumina Natives, Inc.  Minchumina Natives, Inc. cannot *de facto* exist in this manner.  The analogy is readily applied to the present case.  The Millers cannot claim that because they have been the tribal representatives of the Village of Dot Lake since before *1986*, they are the *de facto* tribal representatives of the Village of Dot Lake in *2006*.

In 1993, the BIA (with Congressional approval with the 1994 Federally Recognized Tribe List Act, 108 Stat. 4792) recognized the "Village of Dot Lake" as a federally recognized tribe – under that name and only that name -- as it has every year since 1993.  58 Fed.Reg. 54,364, 54,368-69 (1993).  Congress and the BIA have not recognized the "Dot Lake Village Council" in any capacity whatsoever.  Obviously Congress, if it be deemed to have given the Millers' excuse for a tribal government any consideration, rejected it in 1994 with the Federally Recognized Tribe List Act; in the same manner the BIA has rejected the Dot Lake Village Council every year since 1993.

---

[11] See *infra* at page 10.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 37

For all intents and purposes, the "Dot Lake Village Council" is not a federally recognized tribe; in any event, even Mr. Walleri admits that Village of Dot Lake is not organized under the IRA or any other statute.  Doc. Att. 26, Page 6.

In this manner, Congress and the BIA have implicitly repudiated Dot Lake's 1986 Constitution in a variety of statutory and administrative actions since 1988 as the members, tribal or otherwise, have rejected the Dot Lake Village Council organization by never participating in any annual meeting for 20 years, from 1986 to 2006.

Congress and the BIA have had ample opportunity to recognize the Dot Lake Village Council: updated lists of the BIA's federally recognized tribes are released by the Secretary of the Interior every year, starting in 1995,[12] 1996,[13] 1997,[14] 1998,[15] 2000,[16] 2002,[17] 2003,[18] and 2005.[19]

Pursuant to *Minchumina*, the 1986 Dot Lake Village Council constitution which claims to provide authority to "The Dot Lake Village Council" ceased to exist when (a) Congress said the entity was Village of Dot Lake (as discussed above), or (b) the BIA implicitly rejected the Dot Lake Village Council as the name of the tribal governing body or the name of the tribe

---

[12] Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 60 Fed.Reg.  9250, 9255 (1995).
[13] Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 61 Fed.Reg.  58,211, 58,215 (1996).
[14] Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 62 Fed.Reg.  55,270, 55,275 (1997).
[15] Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 63 Fed.Reg.  71,941, 71,945 (1998).
[16] Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 65 Fed.Reg.  13298 (2000).
[17] Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 67 Fed.Reg.  46328 (2002).
[18] Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 68 Fed.Reg.  68180 (2003).
[19] Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 70 Fed.Reg.  71194 (2005).

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 38

itself, or (c) the Dot Lake voters rejected a constitution for that entity in 1995, or (d) when for every year from 1986 to 2006, the voters, with the exception of Gene Henry, rejected participation in annual meetings involving the Miller Defendants. Dep. of W. Miller at 7:25; 8:1-5.

The case here points out the pivotal importance of a tribal constitution: it is the standard by which tribal official action can and should be judged, by the tribal actors, by the BIA and by the courts. When that action lacks consistency with the tribal constitution, then it is invalid and federal courts will not be reluctant to hold it invalid, but the tribal constitution itself must have status as a governing document. In *Quair,* there is a very specific discussion of a constitution under the title under the articles of community organization which require that all ordinances and resolutions adopted by the general counsel be approved by the BIA. 359 F.Supp.2d at 951. The petitioner in *Quair* noted there was no signature in ordinance 00-27, which was treated as a specific requirement of the "Articles of Community Organization" and voided the ordinance. It is worth noting that this is the level of attention to detail the federal courts are looking for, which are formal and informal requirements that would guide the various constitutional participants, whether it is the BIA in approving the ordinance or the court in reviewing the ordinance.

If there were ever a case that was completely "on all fours" with IRHA's, it is *National Farmers*, discussed in some detail above. Basically, LeRoy Sage – an injured minor – sought a litigation advantage; exactly as in this case. The young man had obtained a tribal court default judgment against a school district after a schoolyard injury.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 39

The school district and its insurer, National Farmers, were non-Indians or non-tribal members. This was not an intra-tribal dispute. Again, exactly as here. No one contends that a state chartered non-profit housing authority who owns one triplex in Dot Lake is a member of the village or a subsidiary corporation of the village. In *National Farmers*, the dispute arose over the meaning, significance and weight of a tribal judgment; exactly as here, with the sole distinction (without a difference) that in *National Farmers* the tribal action was a judgment and here the "Tribal Ordinance" was converted into a state court decision which dismissed IRHA's eviction case. The "Tribal Ordinance" made the state court an enforcement arm of a non-existent tribal court.

Leroy Sage wanted the advantage of that tribal judgment; the tribe wanted to defend its "turf" (its power to right to regulate outsiders who had business interests on the reservation). Exactly as here, where there is a complete coherence in all defendants' litigation positions, with all Defendants vigorously defending the power of the Dot Lake Village Council to adopt Ordinance 06-01-01, as long as there is no factual record, a tactical result they desperately want to achieve.

In *National Farmers* the tribe did not want federal judicial oversight of their position, and, after suffering a preliminary injunction against it in the District Court, obtained dismissal of the school district's/insurer's case in the Ninth Circuit, on lack of federal question jurisdiction grounds, exactly as in this case. *National Farmers* ended, however, with a unanimous reversal of the Ninth Circuit by the United State Supreme Court; ironically another panel of the Ninth Circuit had – just a few weeks earlier – got it right in *Hardin* and said so in dicta, as noted above. To complete the story of *obiter dicta*: when *Chilkat* came out the Ninth

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 40

Circuit, as if to say, *we got it!,* gave its dicta again, that commercial consensual business disputes with non-tribal entities would be resolved on a scope of authority analysis within the framework of sovereign immunity, and cited *National Farmers* as the leading case.

The point is that there is an entirely separate line of cases governing resolution of these disputes. IRHA is ironically one of the few parties disputing tribal official action that can satisfy the *Cort v. Ash* factors since its rights are secured to it under 25 USC Sec. 4137 and it is the beneficiary, generally, of federal rights under NAHASDA and even its status as a state chartered nonprofit is carefully parsed into federal law.

The Defendants in this case want to argue that *Cort v. Ash* is now the law for every challenge to a litigation advantage obtained "in bad faith" by an Indian tribe which advantage is defended to the n[th] degree by the tribe; they will discover, sooner or later, that federal courts have a very different agenda and that the playing field is shaped a lot differently from what they have told this court.

## VI.   ARGUMENT: SUMMARY JUDGMENT SHOLD BE GRANTED AGAINST ALL DEFENDANTS.

This relevant section of the provision which makes this a federal case – and on summary judgment a case which must be decided in favor of IRHA – is titled "Lease requirements and tenant selection," and reads in pertinent part as follows:

> (a)    Leases. --- Except to the extent otherwise provided by or inconsistent with tribal law, in renting dwelling units in affordable housing assisted with grant amounts provided under this Act, the owner or manager of the housing shall utilize leases that ---
>
> (5)    require that the owner or manager may not terminate the tenancy, during the term of the lease, except for serious or repeated violation of the terms or conditions of the lease, violation of applicable Federal, State, tribal, or local law, or *for other good cause*; (emphasis supplied).

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 41

It's worth pausing at the merits of this piece of legislative handiwork. Take state law as an example. A landlord can evict a tenant for nonpayment of rent, for serious violation of a lease, for health and safety reasons – all "bad" tenant behavior – or the landlord can evict a tenant for no reason at all by giving a thirty-day notice, AS 34.03.290, or accomplish the same thing by allowing a lease to expire and retaking possession.

Now back to federal law. Although phrased in the negative – don't use leases that don't comply with this federal law – what is given by Congress is a permission to those who are in the business of "renting [NAHSADA] dwelling units[20] the owner or manager of the housing shall utilize leases that require that the owner or manager may not terminate the tenancy, during the term of the lease, except for serious or repeated violation of the terms or conditions of the lease, violation of applicable Federal, State, tribal, or local law … ." 25 U.S.C. Sec. 4137(a).

So far, state and federal law are roughly parallel, or perfectly aligned for purposes of this case; substandard tenant behavior can result in the tenant being evicted from a NAHASDA dwelling unit under a lease by an owner or manager who is using a lease that complies with 4137(a)(5). But that's easy. What landlord wouldn't use such a lease? What landlord would not take the permission or directing that congress provides and reserves to itself the right to evict for non-payment of rent and other noncompliance with the terms of the lease or violation of federal statute, regulation or local law?

Now to "other good cause". There is no legislative history to elaborate upon this. The relevant HUD regulation supports IRHA's position. 24 CFR Sec. 1000.134 governs circumstances in which a "recipient (or entity funded by a recipient) demolish or dispose of

---

[20] The phraseology used is: "units in affordable housing assisted with grant amounts provided under this chapter." 25 U.S.C. Sec. 4137(a).

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 42

current assisted stock."

> (a) A recipient (or entity funded by a recipient) may undertake a planned demolition or disposal of current assisted stock owned by the recipient or an entity funded by the recipient when:
> (1) A financial analysis demonstrates that it is more cost-effective or housing program-effective for the recipient to demolish or dispose of the unit than to continue to operate or own it ... .

We know what HUD thought of the application of 4137 (and by inference its own regulations) to the facts of this case when it rejected Mr. Walleri's attempt to draw it in the dispute; indeed it sided with IRHA. Doc. Att. 10.

But there is more. "Other good cause" for purposes of this case has a meaning that both parties in state court agree on and that the Dot Lake and Miller defendants have never disputed.[21]

> [T]he term 'good cause' shall mean the tenant['s] act or failure to act causing harm to the premises, personal property or rights of other tenants, tribal members or the general public, including the qui[e]t[] enjoyment of real property by other tenants or adjacent land owners. Doc. Att. 1, Page 2.

Ordinance 06-01-01 says and Walleri trumpeted in his trial brief that the ordinance excluded good cause from a NAHASDA landlord who attempts to evict for other than bad tenant behavior.

So Almquist and IRHA agree on what Sec. 4137(a)(5) means. Congress says that landlords, if they draft their leases with some care or indeed, if they use leases that are modeled on state law, can evict for bad tenant behavior and good reasons of the landlord, absent breaching wrongful or illegal behavior of the tenant. But Almquist took the position that the

---

[21] Dot Lake and the Miller Defendants are stuck with the interpretation of the ordinance as Judge Funk took it: an order to stop the eviction. They can't dispute that's what it means because they allowed, either within or without the scope of their authority, Walleri to present their position to the state court as the official position of the Dot Lake Tribal Council.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 43

tribe could subtract from the landlord's right to evict for "good cause" and to do so during an eviction, and in the middle of trial.

That these are federal rights and duties is made clear not just by the statute but by the Dot Lake Tribal Ordinance, which says how it wants IRHA as TDHE and the only NAHASDA landlord in Dot Lake to interpret Sec. 4137(a)(5): ignore good cause. To accomplish this – reading good cause out of federal law – the Tribal Ordinance says:

> For the purposes of this section and 25 USC 4137, the term "good cause" shall mean the tenant['] s act or failure to act causing harm to the premises, personal property or rights of other tenants, tribal members or the general public, including the qui[e]t[] enjoyment of real property by other tenants or adjacent land owners. Doc. Att. 1, Page 2.

Of course, that limited IRHA's rights to tenant's misconduct or compliance failure, and other tenant-oriented act or omission; there's probably no state law in the United States that refers to the landlord's right to evict for wrongful or illegal behavior as giving the landlord "good cause" to evict. Alaska law in AS 34.03 and the parallel notice protocols of AS 9.45 doesn't use that term. Residential landlord tenant law is a matter, from the tenant's point of view, of strict liability; you either pay the rent or you don't. If you don't, you don't have good cause to stay. If you do, the landlord can't evict on that ground.

The Tribal Ordinance has the effect of voiding the IRHA Landlord-Tenant Rental Contract under which Almquist claims to be bound, provides in Part B-7-d (3) that "After the first month of rental contract, such good cause includes ... (b) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the IRHA's desire to rent the unit for a higher rent)." Doc. Att. 8, Page 3.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 44

The principal claim brought by IRHA is that the Village of Dot Lake cannot adopt a Tribal Ordinance which deletes one of the landlord's "tools" or claims on which the landlord can seek to recover possession of a unit built with NAHASDA funds.   Here, the Miller Defendants, claiming they were acting in the name of the people of Dot Lake, redefined "good cause" – to mean only cause-based behavior by tenants, that is, "bad tenant behavior".   There is no question that IRHA would have been awarded FED relief because the state court found a landlord's good cause was restricted or, in essence, abrogated by the tribal ordinance.   Doc. Att. 2, Page 9.

IRHA labored in state court against a party who obtained a litigation advantage wrongfully, and IRHA is just like the school district and insurer in *National Farmers*.   Leroy Sage, as the story is told by Justice Stevens, sued the school district and obtained a default judgment.   He, himself, wound up on the wrong end as a defendant in *National Farmers Union* in the school district's suit for declaratory and injunctive relief in Federal District Court in Montana and relief was granted, which was ultimately upheld, with the Ninth Circuit being reversed along the way.   The point here is that the party who benefits from the litigation advantage afforded by tribal action – whether in league with the tribe or not – is also a proper party to be sued and preliminarily enjoined from getting any benefit from such advantage, which is just the situation that Defendant Almquist enjoys.   It matters not whether she or her lawyer acted wrongfully; as long as tribal action is challenged and she benefits from it, then she must defend her position in federal court as well.   In any event, there is no appellate court anywhere that's going to call "lawmaking by fax" an official act of any body, and the 1986

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 45

constitution by silence as to lawmaking mechanics wholly undercuts the enforceability of "Tribal Ordinance 06-01-01."

## VII.    ARGUMENT: THIRD MOTION TO DISMISS NOT MERITORIOUS

In their third motion to dismiss, Motion to Dismiss by Native Village of Dot Lake, William J. Miller and Charles Miller, filed in the above-referenced matter on October 18, 2006, Defendants Dot Lake and Millers claim that the "remedy requested in the Complaint violates 28 U.S.C. §2283, and the pending state action calls for abstention under *Younger v. Harris*, 401 U.S. 37 (1971)." Motion at page 1. The *Younger v. Harris* argument was previously raised in Defendant Almquist's Memorandum in Opposition to Motion for Temporary Restraining Order and in Support of Cross Motion for Dismissal filed July 6, 2006 and addressed by IRHA in its Reply in Support of Plaintiff's Motion for Preliminary Injunction and Motion for Temporary Restraining Order as filed on July 12, 2006.

   *1.      28 U.S.C. § 2283: The Anti-Injunction Act.*

28 U.S.C. § 2283, the Anti-Injunction Act, provides as follows: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." As argued herein, IRHA is not seeking an injunction against relief granted by state court, but rather wrongfully withheld by state court. At the argument on the preliminary injunction this court indicated its understanding that, if IRHA prevailed as to the invalidity of the "Tribal Ordinance" at issue in this case, that the state court would then no longer give it any validity.

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 46

Moreover, most of this ground has been plowed, to no advantage in favor of these defendants, since this Court on September 19, 2006 denied the Dot Lake and the Millers Defendants' Motion to Dismiss for Lack of Jurisdiction at Docket No. 44.  As IRHA pointed out in its own opposition, in a recent United States Supreme Court decision on the viability of *Rooker Feldman* abstention, *Exxon Mobil Corp. v. Saudi Basic Industries Corp*, 544 U.S. 280, 125 S.Ct. 1517 (2005) the court, unanimously, sorted out when *Rooker-Feldman* "is … "triggered" by parallel state and federal litigation.  "Where there is parallel state and federal litigation *Rooker-Feldman* is not triggered simply by the entry of judgment in state court." *Id*. at 292.  This Court has repeatedly held that 'the pendency of an action in the state court is not bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Id*. at 292.  (Citing *McClellan v. Carland*, 217 U.S. 268, 282 (1910)).

The same point applies here.  True, Dot Lake/Miller Defendants argue that these proceedings in federal court violate the *Younger* doctrine, as they constitute federal interference with an ongoing state landlord-tenant proceeding.  As discussed and meticulously analyzed in *Columbia Basin Apt. Ass'n v. City of Pasco*, 268 F.3d 791 (9th Cir. 2001), the case cited by Defendant Almquist, "the Younger principle applies [when] important state interests are involved." *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619,627, 106 S.Ct 2718 (1986).  [cited in *Columbia Basin Apt. Ass'n* at 799]  "Younger abstention is required if the state proceedings are (1) ongoing, (2) implicate important state interests, and (3) provide the plaintiff an adequate opportunity to litigate federal claims." *H.C. v. Koppel*, 203 F.3d 610, 613 (9th Cir. 2000) [cited in *Columbia Basin Apt. Ass'n* at 800].

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 47

"Younger and [its progeny] express equitable principles of comity and federalism. They are designed to allow the State an opportunity to 'set its own house in order' when the federal issue is already before a state tribunal. It may not be argued, however, that a federal court is compelled to abstain in every such situation...." *Id.*

Most significantly, "Younger abstention ordinarily would not apply when a federal plaintiff also is the plaintiff in state court." *Id.* at 801, quoting from *Confederated Salish v. Simonich*, 29 F.3rd 1398, 1405 (9th Cir. 1994) (holding that the district court did not err in refusing to abstain under Younger where the federal plaintiff, who was also the state court plaintiff, did not seek to restrain state proceedings or invalidate a state law). That of course is the situation here. IRHA is the plaintiff in both cases; but in the paradigm *Younger* case the federal plaintiff is seeking to enjoin defendants who are themselves proceeding as plaintiff in state court.

In this case, the only state actor, Hon. Ray Funk, state District Court judge, has made clear that he would grant the eviction but for the conduct of the tribal defendants (who are parties to this case, but not the state FED case). Nothing in this litigation seeks to restrain Judge Funk or any state actor from doing some act or to compel him to do an act which he found contrary to state law. The practical and legal effect of the granting of this motion would be to free him from unnecessary subservience to a questionable tribal ordinance that plaintiff believes should not have played a role in his decision-making.

Moreover, in the present case, the state court plaintiff and federal court plaintiff are the same entity; the plaintiff is not seeking to restrain state proceedings or invalidate a state law; no issues of comity or federalism have been claimed; and no state issues are at issue. The issue

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 48

before this court is whether an Alaska Native village has the right to adopt regulations limiting and controlling the authority of IRHA to obtain FED relief *after* the NAHASDA grant funds have been spent on building the housing unit occupied by the plaintiff, a ground lease with Defendant Dot Lake and tenancy with Defendant Almquist were entered into and, finally, after the state court has commenced summary eviction proceedings.

In sum, the *Younger* doctrine is inapplicable to the present case.

**Conclusion**

Summary judgment on Count I should be granted in favor of IRHA and against all Defendants; the motions to dismiss of Defendants, listed above, should be denied.

DATED at Fairbanks, Alaska this 6th day of November, 2006.

ASCHENBRENNER LAW OFFICES, INC.
Attorneys for Plaintiff IRHA


By:   /s/ Peter J. Aschenbrenner
        Peter J. Aschenbrenner
        Bar No. 7210037

Memorandum in Support of Plaintiff's Opposition to Motions to Dismiss and Motion for Partial Summary Judgment
*IRHA v. Almquist, et al.*
Case No. 4:06-CV-00018 RRB
Page 49